The GUARDIANS ASSOCIATION OF the NEW YORK CITY POLICE DEPARTMENT, INC., the Hispanic Society of the New York City Police Department, Inc., Oswaldo Perez, and Felix E. Santos, Individually and on behalf of all others similarly situated, Plaintiffs,

v.

CIVIL SERVICE COMMISSION OF the CITY OF NEW YORK, Department of Personnel of the City of New York, the New York City Police Department, Alphonse D'Ambrose, Individually and in his capacity as Chairman of the Civil Service Commission of the City of New York and Personnel Director of the City of New York, James Smith and Josephine Gambino, Individually and in their capacity as members of the Civil Service Commission of the City of New York, and Michael J. Codd, Individually and in his capacity as Commissioner of the New York City Police Department, Defendants.

No. 76 Civ. 1982.

United States District Court,
S. D. New York.

Feb. 27, 1979.

---

Christopher Crowley, John P. Cooney, New York City, Oscar Garcia-Rivera, Kenneth Kimerling, Puerto Rican Legal Defense and Education Fund, Inc., New York City, for plaintiffs.

Allen G. Schwartz, Corp. counsel, New York City, by Rosemary Carroll, New York City, Paul L. Brennan, of counsel, for defendants.

## OPINION

ROBERT L. CARTER, District Judge.

This is a class action brought by Black and Hispanic police officers challenging discriminatory hiring and firing practices of the New York City Police Department ("NYPD"). The case is currently before the court on remand from the Second Circuit for reconsideration in light of *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). Plaintiffs respond to the remand by making an omnibus motion. They first seek to consolidate this suit with an earlier one between the same parties. Next, they move to amend the complaint in the prior suit to include allegations made in the case at bar. Lastly, they renew their application for a preliminary injunction under a number of separate rubrics.

A chronology of the long history of this lawsuit is required to understand the present motions. In 1972, plaintiffs brought a lawsuit, *Guardians Association v. Civil Service Commission of City of New York*, 72 Civ. 928 ("*Guardians I*"), to declare illegal written employment tests and a height requirement used in making appointments to the NYPD. Plaintiffs alleged violations of 42 U.S.C. §§ 1981 and 1983, Article 5, § 6 of the New York State Constitution, and §§ 50 and 52 of the New York Civil Service Law. By endorsement dated July 12, 1973, Judge Ryan of this court denied a motion for a preliminary injunction on the strength of the NYPD's representation that eligibility lists reflecting scores on the challenged examinations were about to expire. That order was affirmed on November 21, 1973. *Guardians Association v. Civil Service Commission of City of New York*, 490 F.2d 400 (2d Cir. 1973). The court found:

There would have been little use in the court's devoting days of much needed time to umpiring a battle of experts concerning the job-relatedness of examinations whose lists were expected to be approaching exhaustion.

490 F.2d 403. After the Court of Appeals' decision, plaintiffs took no steps to continue the litigation, and defendants took no action to dismiss the case.

In June 1975, New York City laid off a number of policemen in response to the fiscal crisis. On March 24, 1976, over two years after the Court of Appeals' decision in *Guardians I*, plaintiffs attempted to bring on before Judge Ryan a motion for expedited discovery of the impact of the layoffs on minority officers. Judge Ryan, by letter dated March 25, 1976, informed plaintiffs' counsel that the case was closed. Plaintiffs' counsel took exception to the court's conclusion because no order closing the case had ever been entered. Nonetheless, no appeal from Judge Ryan's ruling was filed. Instead, the present action ("*Guardians II*") was commenced before me.

*Guardians II* was instituted on April 30, 1976.[1] The new complaint restated the constitutional claims made in *Guardians I* and advanced several statutory claims, including an assertion that the NYPD's seniority system and "last-hired, first-fired" layoff policy violated Title VII, 42 U.S.C. §§ 2000e, *et seq.* Transgression of that statute had not been argued in the previous action because an amendment making Title VII applicable to municipal employers had taken effect only on March 24, 1972. A request for an injunction reordering the NYPD's seniority system was added to the prayer for relief. In an opinion issued on March 17, 1977, the court rejected plaintiffs' §§ 1981 and 1983 claims because the evidence failed to show intentional discrimination, an essential element of a constitutional violation under *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). Nonetheless, the examinations and height requirement were found to offend Title VII because the NYPD could not justify their discriminato-

---

1. The decision is reported at 431 F.Supp. 526 (S.D.N.Y.1977) (Carter, J.).

ry impact with a showing of "job-relatedness." Since the seniority system perpetuated the effects of the entrance requirements beyond the date Title VII became applicable to municipalities, the court enjoined the NYPD from utilizing its seniority lists for layoff or recall purposes until such time as it could purge the lists of the lingering effects of the discriminatory requirements. *Guardians Association v. Civil Service Commission of City of New York*, 431 F.Supp. 526, 536–38 (S.D.N.Y.1977) (Carter, J.) (*Guardians II*). On June 21, 1977, the Court of Appeals vacated the preliminary injunction and, as indicated previously, remanded the case for reconsideration. 562 F.2d 38 (2d Cir. 1977).

In *Teamsters, supra*, the Supreme Court ruled that a bona fide seniority system which perpetuated pre-Title VII discrimination beyond the effective date of Title VII was not violative of the Act. The Court interpreted § 703(h) of Title VII as immunizing from attack bona fide seniority systems that freeze the consequences of pre-Title VII discrimination. Thus, the Court's mandate effectively overrules this court's prior determination that the NYPD's seniority system, by continuing the effects of past discrimination beyond the date Title VII became applicable to municipalities, violated the Act.[2] A fuller analysis of the impact of *Teamsters* on the merits of this lawsuit is incorporated below in the discussion of plaintiffs' substantive motion to renew the preliminary injunction.

### Plaintiffs' Motion to Consolidate and Amend

The purpose of plaintiffs' motion to consolidate *Guardians I* with *Guardians II* and

to amend the complaint in *Guardians I* to include the theories advanced in *Guardians II* seems to be to permit the claims in *Guardians II* to relate back to the date upon which *Guardians I* was filed. Relation back would then permit avoidance of any time bar that may arise from the Supreme Court's holding that a bona fide seniority system *itself* may not be the object of a Title VII challenge. Since today's decision is unaffected by any time bars for bringing a lawsuit under Title VII, I need not keep apace with plaintiffs' procedural acrobatics.

### Plaintiffs' Motion to Renew the Preliminary Injunction

Plaintiffs invoke a variety of statutory and constitutional provisions in an effort to renew the preliminary injunction. First, plaintiffs argue that, despite *Teamsters*, they are entitled to relief under Title VII. Second, they contend that evidence adduced at the previous hearing also shows the NYPD's employment practices to have offended Title VI, the Revenue Sharing Act, and the New York Constitution.[3] Third, plaintiffs ask that the court reconsider its ruling that 42 U.S.C. § 1981, like 42 U.S.C. § 1983, requires intentional discrimination.[4] The Title VII claim is addressed first, since renewing the previous order would render consideration of the other claims superfluous.

### A. Title VII

Under *Teamsters*, a meritorious Title VII claim against a municipality requires an act of discrimination after March 24, 1972, rather than discrimination before that date

---

**2.** There was no claim that the NYPD's seniority system was anything less than "bona fide" or "neutral."

> The layoffs, as indicated previously, were made in 1975 pursuant to a last-hired, first-fired seniority system *which no one attacks as discriminatory in any way.* (emphasis added)

431 F.Supp. 536.

**3.** Approval of plaintiffs' Title VII claim had obviated the need to consider these additional theories in the earlier opinion. *See Guardians II, supra*, 431 F.Supp. 530 n. 2. In view of the

disposition under Title VI, I again need not decide the Revenue Sharing Act and New York Constitution claims.

**4.** *See Guardians II, supra*, 431 F.Supp. 534. Since this issue is presently sub judice before the Supreme Court, *Davis v. County of Los Angeles*, 566 F.2d 1334 (9th Cir. 1977), *cert. granted*, 437 U.S. 903, 98 S.Ct. 3087, 57 L.Ed.2d 1132, *oral arg.* —— U.S. ——, 99 S.Ct. 346, 58 L.Ed.2d 342, I decline to reconsider the earlier holding.

whose effects are felt thereafter through a facially neutral seniority system. In the prior opinion, the court concluded that the pre-1973 examinations and height requirement violated the strictures of Title VII. If plaintiffs can now show that the results of those entrance tests contributed to discriminatory acts committed *after* March 24, 1972, the *Teamsters* requirement will have been met.

■ Stripped of the argument concerning the NYPD's seniority system, plaintiffs' allegations are reduced to claims of discriminatory refusals to hire. Discriminatory refusal to hire is a well established basis for awarding a discriminatee seniority retroactive to the date upon which he would have been hired but for the discrimination. *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). Retroactive seniority is an appropriate remedy so long as the award does not take into account any period before Title VII governed the employer's practices. *Teamsters, supra.* In a situation analogous to the one at bar, Judge Duffy affirmed that *Teamsters* left intact this remedy for Title VII violations. In that case, policewomen, like the minority class members here, had obtained a ruling that the June 1975 layoffs violated Title VII because they were based on a seniority system which perpetuated past discrimination. The ruling was then revised in light of the Supreme Court's opinion in *Teamsters. Acha v. Beame*, 438 F.Supp. 70 (S.D.N.Y.1977). Judge Duffy held that although the bona fide seniority system could no longer provide the basis for attack, class members could still show discriminatory refusal to hire. He stated:

. . . [A]ny class member who was not hired until after March 24, 1972 and, but for her sex would have been hired

earlier than her actual appointment date, is entitled to a seniority revision.

438 F.Supp. 77. The Court of Appeals affirmed, pointing out that it was also open to plaintiffs to prove post-Title VII violations besides discriminatory refusal to hire. *Acha v. Beame*, 570 F.2d 57, 65 (2d Cir. 1978). Thus the only effect *Teamsters* has on a post-Act discriminatory refusal to hire claim is to limit awards of compensatory seniority to the effective date of Title VII.

Although none of the challenged examinations were administered after March 24, 1972, appointments based on the results were made until October 7, 1974. Also, appointments based on the height requirement were made until 1973, when the NYPD voluntarily discontinued the practice. Defendants argue perfunctorily that the time of the discrimination must be determined by the dates of the tests and not by the dates of the hiring decisions.[5] Clearly, defendants' position is untenable. Unlawful discrimination occurs in the denial of a job based on the examinations, not in the taking of the examinations themselves. There would be little incentive to comply with Title VII if employers could continue to hire from biased eligibility lists because they were based on tests administered prior to the effective date of the Act. Thus refusals to hire minority group applicants after March 24, 1972, on the basis of scores on the examinations or failure to meet the height requirement, are post-Act violations of Title VII.

■ The violations do not incorporate the hiring decisions affecting all class members certified in the court's previous decision, however. The class, defined as all Black and Hispanic New York City policemen currently on layoff who would not have been furloughed but for defendants' allegedly discriminatory practices, includes patrolmen

---

5. Defendants also argue that there were no post March 24, 1972 discriminatory acts because hiring off the challenged lists continued by virtue of a court order keeping the lists open. *Kirton v. Bronstein*, New York Law Journal, November 13, 1972, p. 17 (S.Ct.N.Y. County). We assume that this order was made in conformity with existing state and city stat-

utes. It is no defense for a municipality to claim that its discriminatory practices were mandated by law. Moreover, defendants' argument assumes that their intent is determinative of whether there was a Title VII violation. It is abundantly clear that Title VII looks to the effect of employment practices and not to the employer's intent.

hired *before* March 24, 1972. Discrimination against them ceased as of the day they were hired, *see Cates v. United Airlines, Inc.*, 561 F.2d 1064, 1068 (2d Cir. 1977), and *Teamsters*, therefore, bars their Title VII claims. Thus, only the sub-class of patrolmen hired after March 24, 1972, is entitled to relief. Similarly, members of the sub-class now entitled to relief may receive less seniority because *Teamsters* limits awards of compensatory seniority for municipal employees to March 24, 1972. Thus, despite plaintiffs' protestations, the injunction that may now issue under Title VII is not in all respects as comprehensive as that previously decreed.

■ Other hurdles lie between plaintiffs and even a partial renewal of the preliminary injunction under Title VII. First, a problem arises from the court's earlier definition of the class as populated by officers "currently on layoff." The NYPD avers that all officers previously laid off have either been rehired (some provisionally under the C.E.T.A. program) or have refused offers of re-employment. Nonetheless, the officers' re-employment does not moot the case. The previously furloughed patrolmen still need retroactive seniority to protect against possible future discriminatory layoffs. The class definition is therefore revised to include all Black and Hispanic New York City policemen previously on layoff who would not have been furloughed but for defendants' discriminatory practices.

■■ More importantly, that a sub-class has been victimized by post-Title VII discrimination does not necessarily establish its entitlement to relief. The members of the sub-class must also show that they made a timely administrative challenge to the discrimination as defined in *United Air-*

*lines v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977). There, in a companion case to *Teamsters*, the Supreme Court ruled that a plaintiff, after being laid off and rehired, could not avoid being time-barred from challenging her layoff by styling her claim as a challenge to the lower seniority ranking which followed from the furlough. The Court reasoned that § 703(h) prohibited a finding that a bona fide seniority system, by virtue of its freezing into place the effects of past discrimination, constituted a continuing violation of Title VII. Thus the timeliness of a Title VII challenge must be measured by the date upon which the underlying discriminatory act occurred and not upon the date (often the present) through which the seniority system perpetuated the disadvantage caused by that act.

One of the E.E.O.C. charges filed on May 23, 1975, by the president of the Guardians Association[6] reads as follows:

> NYC as a whole has a Black and Hispanic population of 40%. The NYCPD has a Black and Hispanic population of only 11.6%. Less than 36 of these minorities are superior officers. It is expected that at the end of the life of the existing lists (entrance and promotion) minority representation in the NYCPD will be considerably less.

This charge clearly encompasses a claim of discriminatory refusal to hire; the only question remaining is whether the filing occurred within the applicable limitations period.

The parties are agreed that 300 days is the correct limitations period because the E.E.O.C. referred the charges to the appropriate New York State agency.[7] *See Macklin v. Spector Freight Systems, Inc.*, 156

---

6. Defendants argue that plaintiffs can not rely on these *complaints because they were filed by* the President of the Guardians Association, who was not himself an "individual plaintiff." This argument is without merit. The Guardians Association is a named plaintiff in these proceedings and its president is clearly authorized to act on its behalf. Where a named plaintiff files E.E.O.C. charges, commences a lawsuit, and has a class certified, "the entire class is given the benefit of the date of the

named plaintiff's filing." *See Acha v. Beame, supra*, 438 F.Supp. 76.

7. The following analysis applies only to the examinations. Since the height requirement was terminated over 300 days prior to the filing of the E.E.O.C. complaint, a challenge to it is time-barred. However, this factor does not affect the relief available under Title VII. *See* n. 10, *infra.*

U.S.App.D.C. 69, 76 n.13, 478 F.2d 979, 986 n.13 (1973); *Acha v. Beame, supra,* 438 F.Supp. 75; *see also Love v. Pullman,* 404 U.S. 522, 525–26, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972). Since hiring off the lists did not cease until October 7, 1974, it is clear that *some* refusals to hire occurred within 300 days of the filing of the E.E.O.C. charge. Defendants argue that *only* those officers withheld employment during the 300 day period are entitled to relief because each refusal is a discrete act of discrimination. Consequently, patrolmen denied appointment between March 24, 1972 and July 27, 1974 would be ineligible for relief.

■ Defendants' position ignores the Court of Appeals' determination as to what constitutes a continuing violation under Title VII. After finding that *Evans* did not require abandonment of the concept of a continuing violation under the Act, the court stated:

> A continuously maintained illegal employment policy may be the subject of a valid complaint until a specified number of days after the *last occurrence* of an instance of that policy. *Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239, 246 (3rd Cir.), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975); *Macklin v. Spector Freight Systems, Inc.,* 156 U.S.App.D.C. 69, 76–80, 478 F.2d 979, 986–90 (1973). See also 118 Cong.Rec. 7565 (March 6, 1972). (emphasis in original)
>
> \* \* \* \* \* \*
>
> Such a policy of exclusion can be construed broadly to include, inter alia, dis-

criminatory hiring, assignment, transfer, promotion and discharge.

*Acha v. Beame, supra,* 570 F.2d 65. Thus, all that *Evans* decided was that a bona fide seniority system, although it may perpetuate prior discrimination, is not itself subject to attack as a continuing violation of Title VII. Nonetheless, any *other* kind of illegal employment practice may constitute a continuing violation.

Reliance on *Cates v. Trans-World Airlines, Inc.,* 561 F.2d 1064 (2d Cir. 1977) for the proposition that the doctrine of continuing violations no longer exists in this circuit is misplaced. First, *Cates* preceded *Acha.* Second, the holding in *Cates* is not at all inconsistent with the rule espoused in *Acha.* In *Cates,* the Second Circuit relied on *Evans* to deny relief to plaintiffs who, because their refusal to hire claims were time barred, attempted to challenge directly their seniority status resulting from being withheld employment. Nothing was said in *Cates* about the doctrine of continuing violations as applied to underlying refusals to hire being no longer viable in this circuit. In fact, the court referred to the underlying wrong as a "racially discriminatory hiring system." *Id.* at 1072 (emphasis supplied). The doctrine did not save the plaintiffs' claims only because the challenge was time barred *even when measured from the date of the last refusal to hire.*[8] Thus the court did not hold that an extended pattern of refusals to hire could not evidence a continuing violation; instead, the court merely applied *Evans'*s holding that a neutral seniority system could not constitute such a violation. *Acha'*s explicit adoption of the

---

8. The court reasoned:

> As in *Franks,* the underlying wrong which appellants challenge is not a racially discriminatory seniority system but an allegedly racially discriminatory hiring system which has not functioned since at least 1970. They make no charges of current discrimination or that the seniority system is not bona fide or ever operated in other than a neutral fashion. Their only claim is that appellants occupy a lower spot on the seniority list than they rightfully should because of the perpetuation of prior discrimination. Under *Evans,* this does not charge a present violation of Title VII. Nor does the fact that the present dis-

> advantages arising from past discrimination crystallized in layoffs . . . trigger a new period within which charges may be filed, as the district court believed. . . . [S]ince the neutral seniority system here was insulated from attack by § 703(h), [plaintiffs] can only point to the initial refusal to hire as a violation of Title VII. Because such a claim was not asserted in a timely fashion by any of the appellants, as held by the court below, . . . it has no present legal significance. We therefore affirm the dismissal of appellants' Title VII allegations.

> 561 F.2d 1072.

doctrine of continuing violations as applied to discriminatory refusals to hire is clearly the rule of this circuit.

 It is obvious to the court that hiring from the department's eligibility lists does constitute a continuing policy of discriminatory hiring. The refusals to appoint minorities were not discrete acts; they were all made on the same basis, *viz*, scores on the defective tests. After the tests were administered and the results certified, the NYPD embarked on a discriminatory hiring program which terminated only when the last person was hired off the lists. Since E.E.O.C. charges were filed within 300 days of the last illegal appointment, all plaintiffs are deemed to have made timely challenge to the defendants' discriminatory actions.

██ One further procedural requirement deserves comment. In *Smith v. American Presidential Lines, Ltd. and Marine Engineers' Beneficial Association AFL–CIO*, 571 F.2d 102, 105 (2d Cir. 1977), the Court of Appeals noted that a party charging a continuing violation of Title VII must file with the E.E.O.C. either:

1. a charge showing that the discrimination against him is part of a "continuous pattern of identifiable discriminatory conduct" which is timely as to certain enumerated acts within the pattern, or

2. an amended second charge which was timely as to subsequent discriminatory conduct.

9. Plaintiffs described the violation as "continuing" and pointed to the existing lists as the source of the discriminatory pattern.

10. Relief to everyone hired post-March 24, 1972 is appropriate despite the height requirement's not being the object of a timely challenge. *See* n. 7, *supra*. *All* class members took the offending examinations. On that ground alone they are entitled to the relief provided herein.

11. 42 U.S.C. § 2000d provides:
 No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

12. 42 U.S.C. § 2000d–1 provides:

Plaintiffs have satisfied the first test. It has already been shown that the E.E.O.C. charge was timely as to certain enumerated acts within the discriminatory pattern. The language of the charge makes clear that a continuing violation was actually alleged.[9] Therefore, since the *Teamsters* requirement is met for all class members hired after March 24, 1972, and the *Evans* requirement is met for the entire class, any minority officer hired after March 24, 1972, is entitled to an award of back seniority, so long as the award does not take into account any time period prior to that date.[10] *See Franks v. Bowman Transportation Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); *Teamsters, supra.* This result would deny some class members relief and limit the relief available to many others. It, therefore, becomes necessary to consider theories urged upon the court that might justify resurrection of the preliminary injunction on behalf of the *entire* class.

**B. Title VI**

██ Plaintiffs argue that the earlier finding of illegal discrimination under Title VII encompasses a violation of Title VI, the portion of the Civil Rights Act of 1964 that forbids discrimination by recipients of federal funds. Civil Rights Act of 1964, Title VI § 601.[11] That Title requires each department which disburses funds to issue regulations insuring non-discrimination by recipients, to encourage voluntary compliance with such regulations, and to order a termination of the grant when efforts to secure compliance fail. § 602.[12] Actions of

 Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of section 2000d of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken. No such rule, regulation, or order shall become effective unless and until approved by the President. Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such

the agency are subject to judicial review under the Administrative Procedure Act. § 603.[13] Plaintiffs invoke Title VI in support of their claim that the court's previous injunction should be reissued in its entirety.

A threshold requirement for the adhibition of Title VI to a federal grantee's employment practices appears in § 604. That section provides that the rule of non-discrimination shall apply only to the employment policies of a recipient where employment is a primary objective of the grant. That prerequisite is met here, because the NYPD has received and expended federal funds to pay the salaries of policemen and trainees and to finance recruitment programs. Funds have been obtained from the Departments of Labor, Housing and Urban Development, and Justice. See Defendants' Exhibit I, Chapter IX, NYPD Equal Employment Opportunity Program, 9.3 *et seq.*, 9.12 *et seq.*, 9.13 *et seq.* In addition, the NYPD continues to pay policemen with funds disbursed under the Comprehensive Employment and Training Act. Letter of Rosemary Carroll to the court, dated March 28, 1978.

The major problems raised by plaintiffs' reliance on Title VI are whether a private litigant can assert an implied right of action under § 601 and whether injunctive relief (other than a cut-off of funds) may be ordered. A subsidiary issue is the standard governing illegal employment discrimination under Title VI. These questions will be treated consecutively since an affirmative answer to each is a necessary prelude to considering the next hurdle in plaintiffs' argument.

1. *The Implied Private Right of Action Under Title VI*[14]

Whether there is an implied private right of action under Title VI was recently addressed by the Supreme Court in the various opinions filed in *Regents of the University of California v. Bakke,* 438 U.S. 265, 98

program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, but such termination or refusal shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made and shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found, or (2) by any other means authorized by law: *Provided, however,* That no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means. In the case of any action terminating, or refusing to grant or continue, assistance because of failure to comply with a requirement imposed pursuant to this section, the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action. No such action shall become effective until thirty days have elapsed after the filing of such report.

13. 42 U.S.C. § 2000d–2 provides:

Any department or agency action taken pursuant to section 2000d–1 of this title shall be subject to such judicial review as may otherwise be provided by law for similar action taken by such department or agency on other grounds. In the case of action, not otherwise subject to judicial review, terminating or refusing to grant or to continue financial assistance upon a finding of failure to comply with any requirement imposed pursuant to section 2000d–1 of this title, any person aggrieved (including any State or political subdivision thereof and any agency of either) may obtain judicial review of such action in accordance with section 1009 of Title 5, and such action shall not be deemed committed to unreviewable agency discretion within the meaning of that section.

14. Much of the defendants' brief was devoted to showing that plaintiffs had no standing to allege a violation of Title VI. However, the Supreme Court's decision in *Regents of the University of California v. Bakke,* 438 U.S. 265, 280, 98 S.Ct. 2733, 2743 n. 14, 57 L.Ed.2d 750 (1978), granting standing to a private party allegedly discriminated against by a federal grantee settles the matter in plaintiffs' favor. This holding was separate from the disagreement on the Court about whether an implied cause of action exists; if no such right exists, private parties still have standing to challenge agency action denying them relief. *See* n. 13, *supra.*

S.Ct. 2733, 57 L.Ed.2d 750 (1978).[15] Four Justices found that a private right existed;[16] four avoided the issue, assuming the existence of the right only for purposes of decision in that case;[17] and one Justice found that such a right did not exist.[18]

Justice Stevens contended that the four part test for implying a private right of action set forth in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), is applicable to claims under Title VI. *Bakke, supra,* 98 S.Ct. 2815 n. 28. He found that the first two requirements, whether the person asserting the private right of action is within the "class for whose *especial* benefit the statute was enacted" and whether the cause of action has not been "traditionally relegated to state law," were clearly satisfied.[19] *Ibid.* (emphasis in original). He then concluded that because Congress had not rejected the alternative of a private right of action to enforce § 601 and because a right to sue directly under that section would be consistent with the legislative scheme, a private right of action should be implied.

In taking an opposing position, Justice White asserted that the express provision of private rights of action for violations of Titles II and VII creates a strong presumption that Congress purposefully omitted a private cause of action from Title VI.

*Bakke, supra,* 98 S.Ct. 2795. Nonetheless, it seems to the court that a deliberate intention *not* to afford a private right of action under Title VI is too much to infer from the omission of express language. Justice White fails to note that Congress mentions private rights of action under Titles VII and II only while also specifying restrictions upon the exercise of those rights that do not normally obtain in federal court. For example, Title VII conditioned the right to proceed in court upon a party's first bringing his claim before the Equal Employment Opportunity Commission. 42 U.S.C. 2000e *et seq.* Similarly, Title II provided that a court may defer a request for relief under that section by referring the case to the Community Relations Service. 42 U.S.C. § 2000a–3(d). Failing to create an express private right of action under Title VI is, therefore, wholly consistent with Congress's explicitly creating causes of action only where it also established procedural prerequisites which differ from those ordinarily obtaining in the federal courts. Thus, that there is no express language creating a private right of action in Title VI may only show that Congress did not intend to establish any special procedural requirements for exercising that right in federal court.

Other evidence tending to show that individual discriminatees do not have a cause of

---

**15.** Cases on this issue, prior to *Bakke,* are collected at n. 16 to Justice Powell's opinion for the Court, 98 S.Ct. 2744, and at n. 25 to Justice Stevens' opinion, 98 S.Ct. 2814. Justice Stevens observed that courts "have unanimously concluded or assumed that a private action may be maintained under Title VI." This statement fails to distinguish between decisions finding an implied right of action under § 601 and those merely acknowledging the explicit right under § 603 to judicial review of agency action. At least one court, since *Bakke,* has limited private suits under Title VI to actions of the second type. *NAACP v. Wilmington Medical Center, Inc.,* 453 F.Supp. 280, 299–303 (D.Del.1978). Another court has limited private actions under Title IX in the same way. *Cannon v. University of Chicago,* 559 F.2d 1063, 1071–75, *on reh.,* 1077–83 (7th Cir. 1976), *cert. granted,* 438 U.S. 914, 98 S.Ct. 3142, 57 L.Ed.2d 1159, *oral arg.,* —— U.S. ——, 99 S.Ct. 274, 58 L.Ed.2d 253. The issue is still open in this circuit.

**16.** Justice Stevens's opinion was joined by Chief Justice Burger and Justices Stewart and Rehnquist. *See* 98 S.Ct. 2814–15.

**17.** Justice Powell's opinion was joined, on this issue, by Justices Marshall, Blackmun, and Brennan. *See* 98 S.Ct. 2744–45.

**18.** Justice White's opinion addressed this issue exclusively. *See* 98 S.Ct. 2794–2798.

**19.** This conclusion was uncontroversial. Justice White argued only that the latter two requirements had not been met.

The officers here are no less entitled to assert a private right of action than was Bakke. The conclusion that Bakke is a person for whose especial benefit Title VI was enacted was predicated upon his being a potential beneficiary of a federally funded program. That description applies equally to the minority officers here who are or may be paid with federal funds.

action under Title VI may be found in isolated comments made by speakers during the floor debates. *See Bakke, supra,* 98 S.Ct. 2745 n. 28 (Powell, J.). But, again, this evidence is insufficient to demonstrate that Congress *precluded* the possibility of a private right of action. First, there were a considerable number of statements envisioning private court suits made in the debates. *See Bakke, supra,* 98 S.Ct. 2815 n. 28 (Stevens, J.). Second, comments made in the heat of a floor debate are not scholarly exercises in textual exegesis. Rather they are more or less intentional distortions calculated to promote or inhibit passage of a bill. A few negative comments would be a slender reed upon which to rely in concluding that Congress intended to foreclose the possibility of a private cause of action under Title VI. Stronger evidence of a purposeful rejection is required before the court should refuse to consider whether the implication of such a right would be consistent with the purpose of Title VI's non-discrimination provision when viewed in light of the entire legislative scheme.

Justice White also maintained that a private right of action would impair the administrative mechanism expressly provided by Congress for enforcing the edict of Title VI. The existence of such an impediment would strongly imply that a private right of action is inconsistent with the statute. Justice White reasoned that since Congress surrounded the administrative enforcement process with so many safeguards, it must have intended access to that process to be the exclusive remedy for Title VI violation.

. . . [A] Congress so exceptionally concerned with the satisfaction of procedural preliminaries before confronting fund recipients with the choice of a cutoff or of stopping discriminating would not permit private parties to pose precisely that same dilemma in a greatly widened category of cases with no procedural requirements whatsoever.

98 S.Ct. 2797. (White, J.). To the same effect is *NAACP v. Wilmington Medical Center, Inc.,* 453 F.Supp. 280, 304 (D.Del. 1978), where the court held that deference to Title VI's administrative process required that the standard of judicial review be whether the agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"[20] and not whether the court, in a trial de novo, would have concluded that there had been unlawful discrimination. This standard, being keyed to the agency's decision, would force the reviewing court to consider that:

. . . the suspension of federal aid was a sword which Congress cautioned the agencies to wield judiciously; it was envisioned as a weapon of last resort, designed to provide government agencies with "leverage" in their efforts to secure compliance with this statute.

453 F.Supp. 280, 293. Thus, Justice White in *Bakke* and the court in *Wilmington* seemed to fear that private plaintiffs suing in the District Courts would upset the delicate enforcement machinery established by Congress.

The fault with this view is that it interprets administrative and private remedies as necessarily antagonistic, by needlessly assuming that the relief available in a private suit must be identical to that available through the administrative process. However, since program termination is approved as a remedy only in the section of the statute which creates the administrative enforcement machinery, there seems to be good reason to believe that Congress intended to restrict that sanction to cases where the *agency* seeks such relief or to cases where the private plaintiff can show that the agency's failure to seek such relief was arbitrary and capricious. Thus, all the safeguards contemplated by Congress (i. e. exhausting attempts at voluntary compliance) would obtain in every case before a halt to federal funding was ordered.

---

**20.** The court adopted the test outlined in the Administrative Procedure Act for review of agency action. 5 U.S.C. § 706(2)(A).

The discretionary judgments mandated by the grant termination procedure would not be at all disturbed by a private right of action to redress specific acts of discrimination with familiar forms of declaratory and injunctive relief. Indeed, it makes perfect sense for Congress to have provided a special administrative procedure replete with safeguards *against precipitous action for* claimants seeking the draconian sanction of program termination, *and* to have permitted the possibility of an ordinary private right of action for parties requesting less intrusive forms of declaratory and injunctive relief. Thus a private right of action does not undercut the integrity of the administrative procedure; instead, it preserves that integrity by reserving the termination process for cases of last resort, where the systematic nature of the discrimination or the intensity of the opposition to change makes it impossible to effect compliance through ordinary civil suits. There is no reason why the administrative remedy of negotiated compliance backed by the threat of a funding cut-off (with ultimate judicial review of agency action according to the "arbitrary and capricious" standard) can not coexist fruitfully with a private right of action in which discriminatees can receive traditional equitable relief.[21] As Justice Stevens, citing *Rosado v. Wyman,* 397 U.S. 397, 420, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970), noted in *Bakke* :

> The notion that a private action seeking injunctive or declaratory judgment relief is inconsistent with a federal statute that authorizes termination of funds has clearly been rejected by this Court in prior cases.

98 S.Ct. 2815 n. 26.

One further point deserves comment. The court in *NAACP v. Wilmington Medical Center, Inc.,* 453 F.Supp. 280 (D.Del.1978), rejected the argument that implying a private right of action would facilitate enforcement of an important Congressional policy because it thought the approach overinclusive:

> Enforcement of *every* federal statute would be assisted by implying a private cause of action to parallel an already existing administrative mechanism created by Congress. But such a result in itself is not an acceptable *rationale for* expanding the statutory remedies explicitly provided by the legislature. (emphasis supplied)

453 F.Supp. 302. This response ignores the reason why implying a private right of action under Title VI is *especially* appropriate. Under the statute, administrative agencies are empowered to effect compliance in only two basic ways. They can seek voluntary compliance from grantees or, failing that, order a cut off of federal funds. That choice puts a claimant in the unenviable position of threatening to terminate a program of which he may be a primary beneficiary.[22] Where the victims may suffer worse than the perpetrators, there can not be a very strong incentive to ignite the administrative process against recalcitrant employers. "Relief" as drastic as program termination may be, in fact, worse than no

---

**21.** Some sort of exhaustion of administrative remedies may be required before a plaintiff can exercise his private right of action in court. For reasons stated below, it would be counterproductive to require parties to demand a cut-off of federal funds before they can file a court action seeking less drastic relief. But it might further the purposes of Title VI to require at least the filing of an administrative complaint, so that the agency may attempt to secure voluntary compliance. It is unnecessary for us to consider the issue here, however. Plaintiffs have either met, or would be excused from any exhaustion requirement ultimately settled upon. First, they filed an administrative complaint with the L.E.A.A. in 1975, which has yet to result in a reordering of seniority. Second,

because of the unique history of this lawsuit, this court has already heard testimony and formulated conclusions about whether the NYPD's practices were discriminatory. The only issue still "live" is an exclusively legal one, *viz,* whether the plaintiffs, on the facts as found in *Guardians II,* can receive the same relief under Title VI as they previously received under Title VII.

**22.** For example, if plaintiffs (especially those employed under the C.E.T.A. program) pursue their claim administratively to the point where funds are withheld, they may lose their jobs instead of recovering compensatory seniority.

relief at all. This factor adds dimension to the conclusion of Justice Stevens that:

> . . . [T]he principle embodied in § 601 involves *personal* Federal rights that administrative procedures would not, for the most part, be able to protect. The analogy to the Voting Rights Act of 1965 . . . is clear. Both that Act and Title VI are broadly phrased in terms of personal rights ("no person shall be denied . . ."); both Acts were drafted with broad remedial purposes in mind; and the effectiveness of both Acts would be "severely hampered" without the existence of a private remedy to supplement administrative procedures.

98 S.Ct. 2815 n. 28. Thus, I conclude that a private right of action is implied by § 601's unequivocal prohibition of discrimination in federally funded programs and, for reasons outlined above, I also conclude that all forms of equitable relief are available to a private plaintiff suing under Title VI.

### 2. Standard for Discrimination Under Title VI

Plaintiffs maintain that the "effect" standard enforced under Title VII should apply to employment discrimination challenged under Title VI, while defendants urge that the court adopt the "intent" standard now administered under the Equal Protection Clause. The relevant analysis begins with the language of Title VI[23] and the regulations promulgated thereunder by agencies providing funds to the NYPD. The Labor Department's employment practices regulation reads as follows:

> Where a primary objective of the Federal financial assistance to a program to which this regulation applies is to provide employment, a recipient may not (directly or through contractual or other arrangements) subject an individual to discrimination on the ground of race, color, or national origin in its employment practices under such program including recruitment, examination, appointment, training, promotion, retention or any other personnel action.

29 C.F.R. § 31.3(c)(1). The Departments of Justice and Housing and Urban Development have substantially similar regulations. 24 C.F.R. § 1.5(c)(1) (H.U.D.); 28 C.F.R. § 42.104(c) (Justice).[24] Thus, the question is whether the "discrimination" outlawed need be purposeful or whether it is enough that the challenged policies have a disparate impact on minorities for which there is no countervailing justification.

Support for the thesis that Title VI does not ban only intentional discrimination is overwhelming. The regulations are full of language that evidence an intent to disallow practices with a discriminatory impact. For example, 24 C.F.R. § 1.4(b)(2)(i) (H.U.D.) prohibits a recipient from utilizing "criteria or methods of administration which have the *effect* of subjecting persons to discrimination." Similar provisions may be found at 28 C.F.R. § 42.104(b)(2) and (3) (Justice), and 29 C.F.R. § 31.3(b)(3) (Labor). More importantly, the Supreme Court has held that Title VI disallows measures that have the effect of denying minorities treatment as equals even though that result may not have been the grantee's intention. In *Lau v. Nichols,* 414 U.S. 563, 568, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974), the Court upheld regulations issued by the Department of Health, Education, and Welfare barring practices which, although not so intended, nevertheless effectively denied equal educational opportunity to Chinese-speaking students. I am aware of no decision of a court, prior to or subsequent to *Lau,* holding that a discriminatee under Title VI must show intentional discrimination.[25]

---

23. See n. 11, *supra.*

24. The Attorney General was ordered to coordinate the Title VI programs of the departments and to "adopt consistent and uniform policies, practices, and procedures with respect to the enforcement of Title VI of the Civil Rights Act of 1964." Exec. Order No. 11247, 30 Fed.Reg. 12327 (1965), *reprinted in* 42 U.S.C. § 2000d–1, at 263.

25. For examples of courts applying the effect standard, see *Pabon v. Levine,* 70 F.R.D. 674 (S.D.N.Y.1976) (Weinfeld, J.); *Soria v. Oxnard School District Board of Trustees,* 386 F.Supp. 539 (C.D.Cal.1974). In *Bakke,* Justices Powell and Stevens noted *Lau*'s holding that Title VI prohibited policies with a discriminatory effect without indicating any disapproval.

Defendants argue that *Goodwin v. Wyman,* 330 F.Supp. 1038 (S.D.N.Y.1971) (three-judge court) (per curiam) is authority to the contrary because the court there said:

Essentially, the same showing is required to establish a violation of 42 U.S.C. § 2000d as is required to make out a racial discrimination violation of the Fourteenth Amendment's Equal Protection Clause.

330 F.Supp. 1040 n. 3. Defendants reliance on this statement is misplaced. First, *Goodwin* was decided before *Lau.* Second, *Goodwin*'s equation of Title VI and the 14th Amendment predates *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), the first Supreme Court case to make clear that the 14th Amendment prohibits only intentional discrimination. Prior to the Court's decision in *Washington,* the "effect" and "intent" standards were often applied interchangeably. *See e. g., Dandridge v. Williams,* 397 U.S. 471, 485 n. 17, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).

Moreover, defendants misread the holding in *Goodwin* itself. In that case, New York State recipients of Aid to Dependent Children and Home Relief challenged a statute which reduced their benefits while maintaining constant payments to recipients of Old Age Assistance, Aid to the Blind, and Aid to the Disabled. The selective reductions concededly had a disproportionate impact on minorities. From the court's approval of the statute, defendants have apparently concluded that an "intent" and not an "effect" standard must have been applied.

The court in *Goodwin,* however, acknowledged that "a welfare statute or regulation which is 'infected with a racially discriminatory purpose *or effect* is inherently suspect'" (italics added) (citations omitted). The cuts were upheld only because the court found a compelling state interest in discontinuing benefits to groups of welfare recipients "potentially capable of becoming self-supporting" while "maintaining welfare benefits furnished to citizens who are

physically unable to provide for themselves." 330 F.Supp. 1041. Thus the Court's inquiry was structured very much like that in a Title VII case. After ascertaining that the legislation had a discriminatory *impact,* the court inquired as to whether a compelling justification (like business necessity under Title VII) rendered the statute acceptable.

Justice Powell's pronouncement that "Title VI must be held to proscribe only those racial classifications that would violate the Equal Protection Clause," *Bakke, supra,* 98 S.Ct. 2747, also does not indicate a view contrary to *Lau.* The question in *Bakke* was whether Title VI prohibited *all* racial classifications *per se* or whether it, like the 14th Amendment, prohibited only those racial classifications for which there is no compelling justification. Justice Powell concluded that the two provisions were alike in respect of their prohibiting only unjustified racial classifications. This interpretation, however, says nothing about whether Title VI was designed to reach practices which, although not involving explicit racial classifications, have the effect of disproportionately harming minorities and have no justification in necessity. Concluding that Title VI is like Title VII in prohibiting these practices (and not like the 14th Amendment) is not at all inconsistent with the holding in *Bakke.*

The broad remedial purpose of Title VI shows its close kinship with Title VII. Both Titles were passed at the same time as part of the same act; Title VII applied to private employers while Title VI covered employers who received federal funds targeted to provide employment. It seems to me that a heavy burden rests upon one who theorizes that Congress simultaneously was of two minds on the appropriate standard for employment discrimination, requiring only "disproportionate impact" in one area and "purposefulness" in the other. Furthermore, if Congress indeed entertained two standards in 1964, one would imagine that it would have been more careful in

preserving their separateness when, in 1972, by amending Title VII to apply to municipal employers, it allowed for some overlap between the two titles. The evidence presented by defendants is insufficient to sustain the counter-intuitive result they urge upon the court. It seems far more likely that Congress, not yet ready in 1964 to extend Title VII coverage to all governmental employers, accomplished a similar but more limited purpose in Title VI.

■ Since the substantive standard for illegal employment discrimination is the same under Title VI as it is under Title VII, and all forms of traditional equitable relief are available under Title VI, it seems logical to adopt the body of remedial law already developed under Title VII. Similar kinds of remedies should apply unless they would conflict with some purpose peculiar to Title VI. In the instant case, back seniority, approved as a Title VII remedy in *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976), is just as necessary to make discriminatees "whole" under Title VI. Although the statutory predicate has changed, there is no reason for the relief provided here to be any less comprehensive than that previously ordered in *Guardians II.*[26]

The analysis of how defendants engaged in discriminatory refusals to hire based on the tests and the height requirement remains the same.[27] The only difference is that *all* the refusals to hire were post-Act refusals because Title VI took effect on July 2, 1964.[28] Accordingly, all the members of the class may obtain relief, and their awards of compensatory seniority may extend all the way back to the date upon which they would have been hired but for defendants' discriminatory practices. Thus, the total effect of today's decision that the NYPD's employment practices violated Title VI is to reinstate the preliminary injunction previously issued under Title VII.

Plaintiffs' motion to renew the preliminary injunction is granted under Title VI in accordance with this opinion. I decline to decide plaintiffs' procedural motions because they are unnecessary to the resolution of the case.

SETTLE ORDER.

---

**26.** The employment practices regulations under Title VI are quite comprehensive. For example, 28 C.F.R. § 42.105(c)(1) (Justice) requires non-discrimination in recruitment, recruitment advertising, employment, layoff, termination, upgrading, demotion, transfer, rates of pay or other forms of compensation, and use of facilities. Many of these practices depend upon seniority rankings.

**27.** The Title VI challenge to the height requirement is timely.

**28.** The regulations took effect on December 4, 1964 (Labor), January 3, 1965 (H.U.D.) and July 29, 1966 (Justice).